## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re                                                :        **Chapter 11**
                                                     :
**CENTRAL GROCERS, INC.,** *et al.,*                 :        **Case No. 17– _____ (      )**
                                                     :
                                                     :
Debtors.[1]                                          :        **(Joint Administration Requested)**

-------------------------------------------------------- x

## DECLARATION OF DONALD E. HARER IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Donald E. Harer, pursuant to section 1746 of title 28 of the United States Code,

hereby declare that the following is true to the best of my knowledge, information, and belief:

1.       I am the Chief Restructuring Officer ("**CRO**") of Central Grocers, Inc.

("**CGI**") and its debtor affiliates, including Strack and Van Til Super Market, Inc. ("**Strack**"), in

the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**").[2]  I submit

this declaration (the "**Declaration**") in support of the Debtors' voluntary petitions for relief

under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and pleadings

filed on the date hereof (the "**Commencement Date**") seeking various types of "first day" relief

(collectively, the "**First Day Motions**").  The First Day Motions seek relief to allow the Debtors

to meet necessary obligations and fulfill their duties as debtors in possession and minimize the

adverse effects of the chapter 11 filings on their businesses.  I am familiar with the contents of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Central Grocers, Inc. (3170), CGI Joliet LLC (7014), Currency Express, Inc. (2650), Raceway Central, LLC (2161), Raceway Central Calumet Park LLC (2161), Raceway Central Chicago Heights LLC (2161), Raceway Central Downers Grove LLC (2161), Raceway Central Joliet North LLC (2161), Raceway Central LLC North Valpo (2161), Raceway Central Wheaton LLC (2161), Strack and Van Til Super Market, Inc. (2184), and SVT, LLC (1185).

[2] In addition to serving as the Company's CRO, I am a Managing Director at Conway MacKenzie, Inc., the Debtors' financial advisor and a leading financial and operational consulting firm with 10 offices throughout the United States and over 100 professionals.

each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate their businesses during the pendency of their chapter 11 cases with minimal disruption or loss of productivity and value, constitutes a critical element in executing the Debtors' chapter 11 strategy, and best serves the Debtors, their estates, and all parties in interest.  The facts set forth in each First Day Motion are incorporated herein by reference.

2.       I am familiar with the Debtors' day-to-day operations, books and records, businesses, and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' businesses, employees, operations, and finances; information learned from my review of relevant documents; my discussions with members of the Debtors' senior management and other professionals; information provided to me by employees working under my supervision; or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

3.       This Declaration is intended to provide a summary overview of the Debtors' businesses and their need for relief under chapter 11 of the Bankruptcy Code.  This Declaration has been organized into six (6) sections.  The first section provides an overview of the Company and the Debtors' chapter 11 strategy.  The second section outlines the Debtors' Sale Process (as hereinafter defined).  The third section provides background information on the Debtors' businesses and operations.  The fourth section details the Debtors' corporate and capital structure.  The fifth section describes the events leading to the commencement of these chapter 11 cases and the Debtors' prepetition restructuring efforts.  The sixth section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

# I.

## Overview

4.    CGI is a retail food cooperative that was founded in 1917 by a group of grocery store owners collaborating to achieve buying and marketing efficiencies. Since its inception, CGI has grown to become the largest food cooperative and distributor in the Chicagoland area and, prior to the Commencement Date, was the seventh (7th) largest in the United States. CGI serves, among other parties, and is owned by member retailers (the "**Members**") that operate local supermarkets and large grocery chains. CGI owns a controlling equity interest in Strack. Since it was founded in 1959, Strack has become a cornerstone of the supermarket and food retail industries in the Northwestern Indiana and Chicago metropolitan areas. Strack is CGI's largest Member and operates thirty-six (36) supermarkets under the well-known banners, "Strack & Van Til," "Ultra Foods," and "Town & Country" (collectively, the "**Strack Stores**")

5.    The Debtors have commenced these chapter 11 cases to execute the postpetition phase of their Sale Process. The Sale Process is the lynchpin of the Debtors' chapter 11 strategy and is critical to maximizing recoveries for all creditors and preserving thousands of jobs. In December 2016, the Company embarked on an extensive M&A process to sell its businesses as a going concern or to consummate one or more other strategic, value-maximizing transactions that would resolve the Company's operational and financial challenges (the "**Sale Process**").

6.    During the prepetition phase of the Sale Process, the Company received ten (10) bids for the purchase of certain overlapping and non-overlapping assets, including certain of the Strack Stores, a nearly 1,000,000 square foot distribution and warehousing facility owned and operated by CGI in Joliet, Illinois (the "**Distribution Center**"), and other real and

personal property.   After extensive deliberations with its advisors and Prepetition Secured Lenders (as hereinafter defined), the Company elected to pursue a purchase agreement for the going-concern sale of nineteen (19) Strack Stores with a strategic buyer that would serve as a stalking horse bidder for such stores.  The Debtors expect to execute a stalking horse agreement in the near term and to thereafter seek approval of comprehensive procedures to govern a bidding and auction process for the sale of substantially all of the Debtors' assets (the "**Bidding Procedures**"), including the Distribution Center and the Strack Stores included in the stalking horse bid.

7.     With the assistance of their advisors, and in consultation with their Prepetition Secured Lenders, the Debtors are finalizing Bidding Procedures with the objectives of generating the greatest level of interest in and best value for the Debtors' assets.  The Bidding Procedures will be structured to facilitate the most robust and competitive bidding process possible.  Interested parties will be able to submit bids for individual assets or combinations of the Debtors' assets, including the Strack Stores, the Distribution Center, related inventory, and other valuable real and personal property.  The Debtors' strategy to execute a stalking horse agreement for the sale of a large number of the Strack Stores and to conduct an auction thereafter for all of their marketable assets will ensure that the assets are sold for the highest or otherwise best price, and thereby maximize recoveries for creditors.

8.     A component of the Debtors' chapter 11 strategy includes an orderly and value-maximizing wind down of certain underperforming Strack Stores and other operations, including CGI's warehousing and supply business. While the Debtors are conducting their auction process for the sale of their core assets, they also will be shutting down Closing Stores (as hereinafter defined) and conducting liquidation sales of certain inventory and furniture,

4

fixtures, and equipment ("**FF&E**"). Prior to the commencement of these chapter 11 cases, the Debtors already commenced the wind down of certain of the Strack Stores in which no interest has been shown by a third-party buyer.

9.      Throughout the Sale Process thus far, the Debtors have coordinated with their Prepetition Secured Lenders.  The Debtors intend to maintain this cooperative relationship with their Prepetition Secured Lenders and expect that they will seek approval of the consensual use of cash collateral at the hearing to consider the Debtors' First Day Motions.  In addition, the Debtors are in the process of negotiating and intend to seek the Court's approval of a fully-committed debtor-in-possession financing facility (the "**DIP Facility**") to be provided by certain of the Prepetition Secured Lenders (collectively, the "**DIP Lenders**"). Although the Debtors expect that the DIP Facility, together with the use of cash collateral, will provide them with sufficient runway to consummate value-maximizing sale transactions for substantially all of their assets, it cannot be overstated that time is of the essence.  Given the significant costs associated with the ongoing operations of the Debtors' businesses, the details of which are described below, and the fragility of the Debtors' financial condition, the DIP Lenders likely will require the Debtors to adhere to strict milestones for achieving various objectives throughout their chapter 11 cases. The Debtors expect to be working under an expedited timeline to complete their Sale Process.

10.      As set forth above, the Debtors have sought chapter 11 relief to stabilize their businesses and to execute the final phase their Sale Process.  Although the Sale Process thus far has been successful, the Debtors have determined that their businesses are not sustainable over the long term under the Company's current cost structure. The Debtors intend to use their chapter 11 cases to strategically wind down the Company's operations and to consummate sales

RLF1 17513825V.1

of substantially all of the Debtors' remaining assets free and clear of liabilities. Given the Company's accelerating cash burn, if the Debtors are unable to consummate asset sales free and clear of liabilities within their proposed timeline for these cases, all of the value that has been created and preserved through the prepetition Sale Process could be jeopardized.  Under that scenario, the Debtors could be left with no other option but to commence a fire-sale liquidation of their assets.

11.    The Debtors originally intended to commence these chapter 11 cases after, and not before, executing a binding asset purchase agreement with a stalking horse bidder. Timing and other constraints compelled the Debtors to commence their bankruptcy cases before the parties could fully negotiate mutually acceptable terms of a stalking horse agreement.

12.    In the weeks leading up to the Commencement Date, the Company has suffered severe trade contraction.  Many of the Debtors' key vendors have tightened trade terms, which has constricted the Company's ability to access inventory and ratcheted up the pressure on its already weakened liquidity position.  Trade contraction, coupled with the spread of news of the Company's financial challenges, has led to an unprecedented level of Member defections at CGI. Many Members have terminated their supply arrangements with CGI without paying down outstanding balances owed to CGI for goods delivered.  Unfortunately, this series of events culminated in certain trade creditors of CGI (the "**Petitioning Creditors**") commencing an involuntary chapter 7 proceeding[3] (the "**Involuntary CGI Proceeding**") against it in the Bankruptcy Court for the Northern District of Illinois (the "**Illinois Bankruptcy Court**"). The Debtors intend to move to dismiss the Involuntary CGI Proceeding in favor of these chapter 11

---

[3] *See* Case No. 17-13886.

6

cases and anticipate that they will have the consent of the Petitioning Creditors for such dismissal.

## II.

### The Chapter 11 Strategy

#### A.    Overview

13.    The cornerstone of the Debtors' chapter 11 strategy is their two-pronged Sale Process.  In consultation with their advisors and primary stakeholders, the Debtors have determined that commencing strategic chapter 11 cases to (i) surgically shrink the Debtors' store footprint by shutting down Strack Stores in which no interest has been shown by a going-concern buyer and that cannot be operated profitably, and (ii) consummating going-concern sales of the Debtors' remaining assets free and clear of liabilities, is the best path to preserving as many jobs as possible and maximizing creditor recoveries.

#### B.    Prepetition Sale Process

14.    In December 2016, the Debtors initiated a comprehensive marketing process to find a buyer for, or attract a meaningful investment in, their businesses. To that end, the Debtors retained Peter J. Solomon Company ("**PJSC**") to serve as their investment banker and to design and execute the Sale Process.  PJSC solicited interest from parties in consummating a strategic transaction with the Company, either through a merger or a sale.  PJSC contacted forty-two (42) entities, including sixteen (16) potential strategic buyers and twenty-six (26) potential financial buyers.  Based on responses from those entities, PJSC provided twenty (20) parties with a confidential information memorandum containing confidential information regarding the Company's businesses. Of those parties, six (6) expressed serious interest in consummating a transaction with the Company and were granted access to a data room containing additional confidential information regarding the Company and its assets.

7

15.     By the end of January 2017, the Company had received six (6) bids for overlapping and non-overlapping assets, including certain of the Strack Stores, the Distribution Center, related inventory, and other real and personal property.  Due to the tireless marketing efforts of PJSC and the Debtors' executive management team, competitive tension among the interested parties persisted up to the commencement of these chapter 11 cases.  The Debtors expect to finalize a stalking horse agreement for the sale of a substantial majority of the Strack Stores on a going-concern basis and are devoting extensive resources and efforts toward a robust postpetition marketing and auction process.

**C.     Postpetition Wind Down and Sale Process**

16.     Generally, the postpetition phase of the Sale Process will consist of (i) the sale of core Strack Stores, the Distribution Center, and other marketable assets through an auction process led by a stalking horse bid for the Strack Stores that will be subject to higher or better offers; (ii) the orderly wind down of the Strack Stores in which no potential acquirer has expressed interest; and (iii) the liquidation of inventory and FF&E at the closing Strack Stores and the Distribution Center.  The Debtors, in consultation with their advisors and Prepetition Secured Lenders, have developed procedures to govern various aspects of the Sale Process.  The Sale Process and related procedures are designed to provide the Debtors with flexibility to drive value for their assets within the contemplated timeline for these chapter 11 cases.  As noted, the anticipated milestones under the DIP Facility and order approving the use of cash collateral will require the Debtors to execute the Sale Process quickly and efficiently.

17.     To implement their chapter 11 strategy in an optimal manner, the Debtors intend to file two (2) motions to permit a flexible and expeditious Sale Process: The Wind Down Motion (as defined and described below) and a bidding procedures and sale motion (the "**Bidding Procedures Motion**" and, together with the Wind Down Motion, the "**Sale**

**Motions**"). Together, the procedures set forth and relief requested in the Sale Motions are designed to achieve the maximum interest in the Debtors' assets, with the ultimate goal of driving value for the Debtors' economic stakeholders and preserving as many jobs as possible. Without the speed and flexibility afforded by the relief requested in the Sale Motions, it will be extremely difficult for the Debtors to preserve the value created during the prepetition Sale Process.  A summary of each of the Sale Motions is set forth below.

(i)     *Wind Down Motion*

18.     The Debtors, with the assistance of their advisors have identified and designated fourteen (14) underperforming Strack Stores for near-term closure (collectively, the "**Closing Stores**").  Pursuant to the Wind Down Motion, the Debtors seek to implement store closing procedures (the "**Store Closing Procedures**") to effectuate the closure of the Closing Stores.  The Closing Stores are generally characterized as having negative "four-wall" EBITDA and leasehold value locations.  The Debtors designed the Store Closing Procedures to provide them with an efficient mechanism to quickly liquidate inventory and FF&E at the Closing Stores (collectively, the "**Store Closing Assets**"), in each case, free and clear of liabilities.  The Debtors estimate that the closure of the Closing Stores will generate approximately $2 million in savings each month, and that the sale of Store Closing Assets will yield approximately $15 million in gross proceeds.

19.     The Debtors also are in the process of liquidating the inventory at the Distribution Center as part of their efforts to maximize value through the Sale Process and effect an orderly wind down of CGI's operations.

20.     If the Debtors determine that the leases underlying the Closing Stores cannot be sold or assigned for value, the Debtors need the flexibility to promptly reject such leases pursuant to section 365 of the Bankruptcy Code.  As such, by the Wind Down Motion, the

Debtors also seek approval of procedures (the "**Lease Rejection Procedures**") to govern their rejection of unexpired leases of nonresidential real property and the abandonment of certain surplus, obsolete, non-core, or burdensome assets in connection therewith.  Implementing the Lease Rejection Procedures will allow the Debtors to quickly and efficiently eliminate payment or other performance obligations that do not support the Debtors' chapter 11 strategy.

21.     The relief requested in the Wind Down Motion is integral to maximizing value for the Debtors' estates. Together, the Store Closing Procedures and the Lease Rejection Procedures will permit the orderly shut-down of the Closing Stores and the Distribution Center, provide a uniform mechanism for the rejection of leases and turnover of leased premises to affected landlords, and provide the Debtors with the flexibility needed to execute a critical component of their Sale Process.

### a.     Bidding Procedures Motion

22.     The Debtors soon will file the Bidding Procedures Motion seeking, among other things, approval of Bidding Procedures to govern the sale of their core assets. Under the Bidding Procedures, interested parties will have an opportunity to bid for any of the Debtors' assets included in the auction process.  Given the extensive prepetition marketing efforts and the need for the Debtors to drive value as quickly as possible, the Debtors will seek approval of a timeline for the auction process that is consistent with the deadlines established by the milestones under the anticipated DIP Facility and cash collateral order.

### III.

### The Debtors' Businesses

### A.     CGI

23.     Founded in 1917, CGI is a prominent Midwestern food cooperative and distributor.  Prior to the Commencement Date, CGI provided distribution and retail services to

Members and various patron retailers operating approximately 550 supermarkets and other food and beverage stores.  CGI is incorporated in Illinois and primarily serves Members and customers operating in the Midwestern region of the country, including in Illinois, Indiana, Wisconsin, Michigan, and Iowa. CGI is owned by its Members, who in turn operate local supermarkets and major grocery chains. By virtue of their member-ownership, Members benefit from economies of scale achieved by purchasing merchandise from CGI, and through their receipt of patronage rebates on account of such purchases.

24.     CGI currently employs approximately 550 employees, approximately seventy-five percent (75%) of whom are represented by local unions and employed by CGI pursuant to one of four (4) collective bargaining agreements ("**CBAs**"). As of the Commencement Date, CGI has approximately $262 million (book value) in total assets, and approximately $232 million in total liabilities.

25.     In 2009, CGI moved its headquarters to Joliet, Illinois, where it owns a tract of land on which the Distribution Center was constructed (the "**CGI Campus**"). The CGI Campus covers fifty-three (53) acres and includes a nearly 1,000,000 square foot building comprising the Distribution Center and CGI's corporate office space.  CGI stocks approximately 20,000 stock keeping units made up primarily of dry groceries, fresh meats, frozen foods, produce, eggs, dairy, and deli products.   Approximately ninety percent (90%) of CGI's distribution volume is comprised of nationally branded products.  The remaining ten percent (10%) of CGI's distribution volume is comprised of CGI's private label line of food products sold under the "Centrella" brand name.  CGI delivers products to stores utilizing a fleet of leased and owned tractors and trailers.

**(i)**     *CGI's Cost Structure*

11

26.    CGI's cost structure includes certain fixed and variable costs, including, among other things, costs attributable to obligations to employees, Members, and Patrons; administrative expenses; and purchasing, warehousing, and shipping of merchandise.

### a.    Trade Expenses

27.    CGI's greatest expense is for the purchase of merchandise, which totaled approximately $1.24 billion in 2016.  The cost of goods sold equaled approximately seventy percent (90%) of CGI's net sales for the same period.  Historically, as a result of its regular high-volume purchases, CGI has been able to command strong supplier rebates and obtain products at lower costs than independent retailers.  In recent weeks, however, many of CGI's key vendors have reacted to news of CGI's liquidity challenges by imposing onerous trade terms and, in several instances, demanded deposits, payment of outstanding Trade Claims (as hereinafter defined), and cash in advance of shipping new merchandise to CGI.  This recent trade contraction, culminating in the Petitioning Creditors' commencing the Involuntary CGI Proceeding, has negatively impacted the Company's operations and financial condition.

### b.    Employee-Related Obligations

28.    CGI currently employs approximately 550 employees, approximately 510 of whom are employed on a full-time basis, thirty (30) on a part-time basis, and ten (10) on a seasonal basis.  Nearly seventy-five percent (75%) of CGI's workforce is represented by unions. CGI is party to four (4) CBAs with bargaining units of the International Brotherhood of Teamsters ("**Teamsters**"), Locals 710 and 703/738, and the International Union, Security, Police, Fire Professionals of America.  The CBAs govern the terms of unionized employees' employment, including with respect to health and welfare benefits provided by CGI, vacation and other time off, wages, working hours, seniority guidelines, and more.  On average, CGI's gross payroll is approximately $3 million each month.

29.     In addition to payroll obligations, CGI incurs various other costs on account of employee-related obligations.   Pursuant to its CBA with Teamsters, Local 703/738, CGI makes, on behalf of covered employees, contributions to a multi-employer pension plan (the "**CGI Pension Plan**"), which is jointly administered by union officials and participating employer trustees.   CGI contributed approximately $5.6 million to the CGI Pension Plan in the fiscal year ending July 30, 2016.   Additionally, CGI provides or contributes to a number of other benefit plans that provide medical, dental, vision, life, and disability insurance and other ancillary benefits to its employees.   The Debtors also pay annual premiums on account of workers' compensation insurance.   In 2016, CGI's employee-related obligations totaled approximately $64.3 million, which accounted for approximately five percent (5%) of CGI's net sales.

**B.      Strack**

30.     Strack was formed by two independent grocers, Ernie Strack and Nick Van Til, each of whom operated groceries in Northwestern Indiana prior to joining forces in 1959.   Ernie and Nick set out to create a modern supermarket that would offer a more exciting shopping experience for customers.   This vision came to life when Strack opened its first store in Highland, Indiana in 1960.   Since that time, Strack has grown to a grocery chain comprised of thirty-six (36) Strack Stores across Northwestern Indiana and the Chicagoland area of Illinois, and has become CGI's largest Member and a pillar of the communities it serves.   Strack also is the largest employer in Northern Indiana, currently employing approximately 4,250 employees.   Approximately eighty percent (80%) of Strack's workforce is represented by unions and employed by Strack pursuant to one of twenty (20) CBAs.   As of the Commencement Date, Strack reported total assets (book value) of approximately $183 million and total liabilities of approximately $141 million

13

31.     In 1998, CGI acquired an eighty-one percent (81%) equity interest in Strack.  Strack's annualized sales in 2016 were approximately $905 million, which represented approximately fifty-one percent (51%) of CGI's sales volume for that year.

**(i)     *Strack's Cost Structure***

32.     Much like CGI's, Strack's cost structure includes certain fixed and variable costs, including, among other things, costs attributable to obligations to employees, real estate, marketing and advertising, administrative expenses, and purchasing and shipping merchandise.

**a.     Trade Expenses**

33.     Strack's greatest expense is its inventory, which expense totaled approximately $685 million in 2016.  The cost of goods sold equaled approximately seventy-six percent (76%) of Strack's annual net sales for the same period.  Strack sources approximately sixty-one percent (61%) of its merchandise from CGI, to which it paid approximately $593 million in 2016.  Strack's sales and store traffic generally are highly dependent on CGI's ability to maintain strong relationships and favorable trade terms with its network of vendors and suppliers.  As stated above, CGI historically was able to obtain valuable supplier rebates and products at lower prices as a result of its regular high-volume purchases.  These benefits were, in turn, passed along to Members like Strack. Strack purchases the remaining approximately thirty-nine percent (39%) of its merchandise from a network of approximately 250 vendors.

**b.     Real Estate**

34.     Strack leases all of its store locations,[4] a warehousing facility in Munster, Indiana, and a bakery commissary in Valparaiso, Indiana under operating leases that expire on

---

[4] SVT leases eight (8) of its store locations from other Debtors in these chapter 11 cases: CGI (Store Nos. 8757, 8761, and 8779); Raceway Central, LLC (Store No. 8785); Raceway Central, LLC North Valpo (Store No. 8750);

14

various dates through 2032.  In 2016, Strack's lease obligations totaled approximately $16.1 million, which accounted for approximately two percent (2%) of Strack's net sales for the same period.  Strack also owns a 58,000 square foot office and warehousing facility in Highland, Indiana, which is home to Strack's corporate headquarters.

### c.   Employee Obligations

35.   As stated above, Strack currently employs approximately 4,250 employees, approximately 950 of whom are employed on a full-time basis, and approximately 3,330 on a part-time basis.   Nearly eighty-one percent (81%) of Strack's workforce is represented by unions.  Strack is a party to twenty (20) CBAs with various bargaining units of international and local unions, including the United Food and Commercial Workers Union, Locals 881 and 1546; the UFCW International Union, Local 700; Teamsters, Local 142; and the Independent Employees Union. On average, Strack's gross payroll is approximately $8 million each month.

36.   In addition to payroll obligations, Strack incurs various other costs on account of employee-related obligations.  Pursuant to certain of its CBAs, Strack makes, on behalf of covered employees, contributions to three (3)  multi-employer pension plans, which are jointly administered by union representatives and participating employer trustees (collectively, the "**Strack Pension Plans**").  In 2016, Strack's contributions to the Strack Pension Plans totaled approximately $3 million in the aggregate.  Additionally, Strack provides or contributes to a number of other benefit plans that provide medical, dental, vision, life, and disability insurance and other ancillary benefits to its employees.  In 2016, Strack's employee-related obligations

---

Raceway Central Downers Grove, LLC (Store No. 8762); Raceway Central Joliet North, LLC (Store No. 8763); and Raceway Central Wheaton LLC (Store No. 8758).

totaled approximately $101 million, which accounted for approximately eleven percent (11%) of Strack's net sales during that period.

## IV.

## Corporate and Capital Structure

### A.    Corporate Structure

37.    As all of the Debtors are privately-held companies, none of their equity securities are publicly traded.  CGI's equity structure is comprised of two (2) classes of common stock, "**CGI Class A Shares**" and "**CGI Class B Shares**." Pursuant to CGI's By-Laws, CGI Class A Shares are voting stock and may only be owned by CGI's Members.  No Member may own more than five (5) CGI Class A Shares.  CGI Class B Shares are held by Members and certain current and former members of the Company's management team.

38.    Strack's equity structure also is comprised of two (2) classes of common stock, "**Strack Series A Shares**" and "**Strack Series B Shares**." CGI owns eighty percent (80%) of the Strack Series A Shares, and eighty-one percent (81%) of the Strack Series B Shares.

39.    Each of the other Debtors is a subsidiary of CGI or Strack.    An organizational chart illustrating the Company's corporate structure is attached hereto as **Exhibit A**.

### B.    Capital Structure

40.    The Debtors' primary prepetition indebtedness consists of secured financing obligations, which amount to approximately $225 million as of the commencement of these chapter 11 cases (the "**Prepetition Secured Debt**").  The Prepetition Secured Debt funds the operations of the entire Company.

16

**(i)**     *Prepetition Revolving Credit Facility*

41.     Pursuant to that certain Credit Agreement, dated as of June 15, 2011 (as amended, supplemented, or otherwise modified from time to time, the "**Prepetition Revolving Credit Agreement**"), by and among CGI, as borrower; Strack, SVT, LLC ("**SVT**"), and Raceway Central, LLC ("**Raceway Central**"), each as guarantors (Strack, SVT, and Raceway Central, collectively, the "**Revolving Credit Facility Guarantors**"); PNC Bank, National Association, as administrative agent (the "**Revolving Credit Facility Agent**"); and each of the lenders party thereto (the "**Revolving Credit Facility Lenders**"), the Revolving Credit Facility Lenders extended to CGI a revolving credit facility in an amount up to $150 million, which also includes (i) a $15 million letter of credit subfacility, and (ii) a $15 million swing loan facility (collectively, the "**Prepetition Revolving Credit Facility**"). The Revolving Credit Commitments (as defined under the Prepetition Revolving Credit Agreement) originally were due to terminate on June 15, 2016. Pursuant to that certain First Amendment to Credit Agreement, dated as of December 7, 2012, the Revolving Credit Commitments available under the Prepetition Revolving Credit Facility were increased to $225 million, and the termination date of such commitments was extended to December 7, 2017.

42.     Performance and payment of the obligations under the Prepetition Revolving Credit Facility is guaranteed by each of the Revolving Credit Facility Guarantors, pursuant to that certain Continuing Agreement of Guaranty and Suretyship, dated as of June 15, 2011. Additionally, the Debtors' obligations under the Prepetition Revolving Credit Facility are secured pursuant to that certain Guaranty and Security Agreement, dated as June 15, 2011 (as amended, supplemented, or otherwise modified from time to time, the "**Revolving Credit Facility Security Agreement**"). Pursuant to the Revolving Credit Facility Security Agreement, each of CGI and the Revolving Credit Facility Guarantors granted a first-priority lien on

17

substantially all of their assets, including, all accounts, monies, cash, cash equivalents, goods, inventory, equipment, chattel paper, securities and all other investment property, contract rights, insurance proceeds, documents, and general intangibles (collectively, the "**Prepetition Collateral**"), in favor of the Revolving Credit Facility Agent for the benefit of the Revolving Credit Facility Lenders and certain other secured parties.

43.    The Revolving Credit Facility Agent was granted a second-priority mortgage on the CGI Campus, pursuant to that certain Mortgage, Security Agreement, Assignment of Leases and Rents, and Financing Statement, dated as of October 28, 2016, by CGI Joliet, LLC ("**CGI Joliet**"), as mortgagor, to the Revolving Credit Facility Agent, as mortgagee, for the benefit of the Revolving Credit Facility Lenders. Also, as a condition to the Revolving Credit Facility Lenders' agreement to forbear from exercising rights and remedies with respect to certain defaults of the Debtors under the Prepetition Revolving Credit Agreement, the Revolving Credit Facility Agent was granted first-priority mortgages on certain properties of the Debtors, for the benefit of the Revolving Credit Facility Lenders.

44.    As discussed in further detail below, pursuant to that certain Forbearance Agreement and Fifth Amendment to Credit Agreement, dated as of January 27, 2017, the Debtors' borrowing limit under the Prepetition Revolving Credit Facility was reduced to $205 million as a condition to the Revolving Credit Facility Lenders' agreement to forbear from exercising rights and remedies with respect to certain defaults of the Debtors under the Prepetition Revolving Credit Agreement.

45.    As of the Commencement Date, the Debtors' outstanding funded obligations under the Prepetition Revolving Credit Facility amount to approximately $200 million in loans, and approximately $2.4 million in outstanding undrawn letters of credit.

(ii)    *Prepetition Term Loan Facility*

46.    Pursuant to that certain Term Loan Agreement, dated as of April 24, 2013 (as amended, supplemented, or otherwise modified from time to time, the "**Prepetition Term Loan Agreement**"), by and among CGI and CGI Joliet (together, the "**Term Loan Borrowers**"), as borrowers; Bank of the West, as administrative agent (the "**Term Loan Agent**"); and the lenders party thereto (the "**Term Loan Lenders**" and, together with the Revolving Credit Facility Lenders, the "**Prepetition Secured Lenders**"), the Term Loan Lenders extended to the Term Loan Borrowers a term loan in an aggregate principal amount of $25 million (the "**Prepetition Term Loan Facility**").  The Prepetition Term Loan Facility matures on May 1, 2023.

47.    The obligations under the Prepetition Term Loan Facility are secured by a first-lien mortgage on the CGI Campus pursuant to that certain Mortgage, Security Agreement, Assignment of Leases and Rents, and Financing Statement, dated as of April 24, 2013, by CGI Joliet, as mortgagor, to the Term Loan Agent, as mortgagee, for the benefit of the Term Loan Lenders.  Pursuant to that certain Security Agreement, dated as of October 28, 2016, each of Strack, SVT, and Raceway Central (collectively, the "**Term Loan Guarantors**") and the Term Loan Borrowers granted a second-priority lien on the Prepetition Collateral in favor of the Term Loan Agent for the benefit of the Term Loan Lenders and certain other secured parties.  In addition, the Term Loan Lenders required the Term Loan Guarantors to guarantee the Debtors' obligations under the Prepetition Term Loan Facility, pursuant to that certain Continuing Agreement of Guaranty and Suretyship, dated as of October 28, 2016.

48.    As of the Commencement Date, the Debtors' outstanding funded obligations under the Prepetition Term Loan Facility amount to approximately $22.5 million.

(iii)    *Intercreditor Agreement*

49.    Pursuant to that certain Amended and Restated Intercreditor Agreement, dated as of October 28, 2016, by and between the Revolving Credit Facility Agent and the Term Loan Agent, and acknowledged and consented to by the Debtors (as amended, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"), the security interests in the Prepetition Collateral that secure the Prepetition Term Loan Facility obligations and the guarantees thereof are contractually subordinated and junior to the liens that secure the obligations under the Prepetition Revolving Credit Facility.  The Revolving Credit Facility Agent's lien on the CGI Campus is subject to the first-priority mortgage of the Term Loan Agent.  The restrictions on the respective parties' ability to exercise remedies against the Prepetition Collateral and the CGI Campus also are governed by the Intercreditor Agreement.

(iv)    *Unsecured Debt*

50.    In addition to the Prepetition Secured Debt, the Debtors have significant prepetition unsecured debt, including payables owed to trade creditors and landlords.

a.    **Trade Claims**

51.    In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (collectively, the "**Trade Claims**") to various third-party providers of goods and services (collectively, the "**Trade Creditors**").  As of the date hereof, the Debtors estimate that the aggregate amount of Trade Claims outstanding is approximately $43 million.  Certain of the Trade Claims are entitled to statutory priority, such as under PACA or PASA (each as hereinafter defined) or under section 503(b)(9) of the Bankruptcy Code; may give rise to shippers, warehouseman, or mechanics liens against the Debtors' property if unpaid; relate to funds held in trust by the Debtors that are not the property of the Debtors' estates; or are secured by letters of credit, security deposits, or rights of setoff

20

(collectively, the "**Priority Trade Claims**").  Excluding the Priority Trade Claims, the Debtors

estimate that the total Trade Claims equal approximately $4.5 million.

> **b.**     **Lease Obligations**

52.     As detailed above, Strack leases all of its store locations.  The Debtors

estimate that, as of the date hereof, the aggregate amount of outstanding lease-related expenses is

approximately $2 million.

> **(v)**     ***Intercompany Claims***

53.     Certain of the Debtors hold claims against each other ("**Intercompany**

**Claims**"), which arise primarily from the multifaceted relationship between CGI and Strack.  As

described above, CGI is the largest supplier of goods sold in the Strack Stores. As Strack

purchases inventory from CGI, the Debtors record an intercompany receivable on CGI's balance

sheet and an intercompany payable on Strack's balance sheet.  CGI and certain of its Debtor

subsidiaries are landlords for the leased premises on which eight (8) Strack Stores operate.  As

such, CGI pays the rent for the applicable Strack Stores on Strack's behalf.  These rent payments

are recorded on the Debtors' respective books and records in the manner described above. CGI

also fronts other expenses for Strack, such as insurance premiums under policies covering both

entities and their subsidiaries.  Similarly, such payments are recorded on CGI's balance sheet as

an accounts receivable, and on Strack's balance sheet as an accounts payable.

54.     The Debtors have established a certain level of minimum liquidity

necessary for Strack to cover its operating expenses each week (the "**Strack Cash Minimum**").

The Strack Cash Minimum generally ranges between $8 and $10 million, and varies based on the

expenses that come due and payable in a particular week.  The Strack Cash Minimum is funded,

in part, by the Prepetition Secured Debt.  Because Strack is not a borrower under either the

Prepetition Revolving Credit Facility or the Prepetition Term Loan Facility, CGI either advances

funds to Strack or obtains credit on Strack's behalf, which, in each instance, creates an Intercompany Claim of CGI against Strack.

**V.**

**The Need for Chapter 11 Relief and the**
**Events Compelling the Commencement of the Chapter 11 Cases**

**A.      Competitive Industry**

55.      The retail food industry is highly competitive, and has become even more challenging for the Company to navigate as consumer preferences continue to shift at a rapid pace.  Consumers have been increasingly prioritizing the combination of convenience and low cost.  While the traditional, independent grocer has long faced peripheral competitive challenges from the likes of warehouse clubs, drug stores, and convenience stores, it now is losing market share to online retailers. Given the Debtors' liquidity challenges, they have not been able to sufficiently invest in new technology and e-commerce to allow them to stave off competition from online giants like Amazon and Google, innovative companies focusing exclusively on food delivery, and modern grocery stores that offer online ordering and delivery services to their customers.

56.      Adding to this pressure is the recently explosive growth in consumer demand for a "gourmet" shopping experience complete with offerings of natural, organic, and gluten-free foods. Some of the Debtors' competitors have expanded aggressively in marketing a range of natural and organic foods, prepared foods, and quality specialty grocery items.  The Debtors have been at a competitive disadvantage to companies that have the financial flexibility to devote greater resources to sourcing, promoting, and selling the most in-demand products.

57.      This challenging operating environment has been exacerbated by the recent, drastic spike in "food deflation." Historically, the food retailing industry has been

22

characterized by local, regional, and national competitors operating on slim profit margins. The collectively low profit margin is a product of the large amount of competition due to the relatively low barrier of entry into the market. As such, grocery stores must make up for low margins by selling large quantities of products. The Debtors are no strangers to these market conditions. Recently, however, food prices have sunk to unprecedented lows. According to the United States Department of Agriculture, consumers paid less for grocery store foods in 2016 than they did in 2015. This is the first time that food retail prices did not increase over those of the previous year since 1967.[5] Such intense food deflation has produced a heavier than normal promotional environment, as many retailers have reacted to the market by engaging in aggressive price wars to maintain competitive edge.

**B.      Inability to Make Necessary Capital Investments**

58.     As noted, food retailers must invest in operations to stay up to speed with the latest industry developments to survive. Now is a pivotal time in the industry, with market participants introducing technological advances and other initiatives to customize and improve consumer experience. Moreover, companies are also implementing cost-saving technologies and practices that allow them to further lower their prices, including in the areas of labor scheduling, ordering, receiving, payment processing, and data analytics. Capital improvements are thus imperative for food retailers to keep pace with their competition.

59.     Given the Company's obligations under the Prepetition Secured Debt and operating expenses, the Debtors do not enjoy the financial flexibility they require to invest in their businesses at the level and speed at which the food retail industry is evolving. As a result of

---

[5] *See Consumers Paid Less for Grocery Store Foods in 2016 than in 2015*, Annemarie Kuhns and David Levin, March 6, 2017, *available at* https://www.ers.usda.gov/amber-waves/2017/march/consumers-paid-less-for-grocery-store-foods-in-2016-than-in-2015/.

the Debtors' extremely limited financial flexibility, the Company has suffered from a competitive disadvantage when compared to its traditional and non-traditional peers.

## C.    Trade Contraction

60.    The lifeline of the Debtors' businesses is their access to and relationship with their network of vendors and suppliers.  As a retail food cooperative, the success of CGI's business is centered on CGI's ability to provide Members, Patrons, and customers with a full assortment of products commensurate with demand, and in a manner that allows such parties to benefit from CGI's ability to purchase goods at wholesale prices.  Strack's ability to generate income is wholly dependent on sales.  If the quality of Strack's inventory goes down, so too do sales.  The vast majority of the Debtors' vendors supply goods to the Debtors on an invoice-by-invoice basis, and not pursuant to long-term supply contracts.  As such, these vendors typically supply customers with products on trade terms based on their experience with and perceived risk of conducting business with such customers.

61.    In the weeks leading up to the commencement of these chapter 11 cases, many of the Company's key vendors have reacted to news of the Debtors' financial challenges by demanding drastic modifications of the terms on which they will deliver goods to the Company.  Certain vendors have demanded reduced payment schedules. Other vendors have gone further and demanded that they be paid cash in advance, including any outstanding Trade Claims, as a condition to the continued delivery of merchandise.  Recent trade contraction has had a severe impact on the Company's liquidity position.  As noted above, given that Strack is CGI's largest Member, the success of CGI's business largely is dependent on Strack's.  Strack's sales reflect the quality of Strack's inventory and the quickness with which it is replenished at the Strack Stores. Recently, Strack has worked to counteract trade contraction at CGI by sourcing goods historically supplied by CGI from alternative suppliers. As discussed in further

24

detail below, part of the Debtors' strategy is to seek relief to pay the Trade Claims of certain vendors determined to be critical to the Debtors' businesses to restore confidence of their key vendors and customers and to preserve the going-concern value of the Strack Stores through the Sale Process.

**D.      Involuntary CGI Proceeding**

62.      As set forth above, on May 2, 2017, the Petitioning Creditors commenced the Involuntary CGI Proceeding in the Illinois Bankruptcy Court.  To avoid the dissipation of value created through the prepetition Sale Process and to safeguard their chapter 11 strategy, the Debtors commenced these chapter 11 cases earlier than they had intended, without a binding stalking horse bid in hand.  Even with this setback, the Debtors are confident that the Sale Process will produce the highest or best value for their assets. Additionally, as stated above, the Debtors expect to be able to move to withdraw or dismiss the CGI Involuntary Proceeding, with the consent of the Petitioning Creditors.

**First Day Motions**[6]

63.      Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions seeking relief that is necessary to enable the Debtors to smoothly transition into these chapter 11 cases and minimize disruptions to their business operations.  I respectfully submit that the relief requested in each First Day Motion should be granted because such relief is a critical element in stabilizing the Debtors' businesses during and facilitating the successful execution of the Debtors' postpetition Sale Process.  A summary of the relief requested in each First Day Motion is set forth below.  I have reviewed each of the First Day Motions and confirm that all of the facts set forth therein are true and correct to the best of

---

[6] Capitalized terms used but not defined in this section of the Declaration shall have the respective meanings ascribed to such terms in the relevant First Day Motions.

my knowledge and belief, based upon my personal knowledge of the of the Debtors' businesses, employees, operations, and finances; information learned from my review of relevant documents; my discussions with members of the Debtors' senior management and advisors; information provided to me by employees working under my supervision; or my opinion based upon experience, knowledge,  and information concerning the Debtors' businesses.

## A.    Administrative Motions

### (i)    *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>")*

64.    The Debtors request entry of an order (i) directing joint administration of their chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), (ii) providing that the Court maintain one file and one docket for all of the Debtors' chapter 11 cases under the lead case, *In re Central Grocers, Inc., et al.*

65.    I understand that a court may order the joint administration of multiple chapter 11 cases where debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.  CGI owns an eighty-one percent (81%) interest in Strack, and each of the other Debtors is a direct or indirect subsidiary of either CGI or Strack.   Accordingly, I understand that the Debtors are "affiliates" and this Court is authorized to order joint administration of their estates. Joint administration of the chapter 11 cases will allow for the efficient and convenient administration of the Debtors' interrelated chapter 11 cases, will yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

66.    The Debtors operate as an integrated business with common ownership and control.  The Debtors also share a number of financial and operational systems.  As a result, many of the motions and orders that will be filed and entered in the chapter 11 cases almost certainly will affect each Debtor.  The entry of an order directing joint administration of the

chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency. The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption.

### (ii)    *Motion of Debtors for Entry of Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs*

67.    The Debtors request entry of an order extending the initial thirty (30) day period to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") by sixty (60) days, to allow the Debtors a total of ninety (90) days after the Commencement Date to file their Schedules and Statements, without prejudice to the Debtors' right to request additional time if necessary.

68.    To prepare the Schedules and Statements, the Debtors must compile information from books, records, and other documents relating to, among other things, accounts payable and receivable, real estate leases, employee wages and benefits, intercompany transactions, and vendor and supplier agreements.    The Debtors' resources are strained. Completing the Schedules and Statements within the first thirty (30) days of these chapter 11 cases would be time-consuming, costly, and distracting at a critical time for the Debtors' businesses and their Sale Process.

### (iii)    *Motion of Debtors for Authorization to File a Consolidated List of Creditors*

69.    The Debtors request authority, but not direction, to file a consolidated list of creditors in lieu of separate mailing matrices for each Debtor.    Given the large number of creditors in these chapter 11 cases, this information may be utilized most efficiently by providing parties with notices and other similar documents on a consolidated basis.    Additionally, in

consultation with Prime Clerk LLC ("**Prime Clerk**"), the Debtors' proposed claims and noticing agent and administrative advisor in these chapter 11 cases, the Debtors believe that maintaining a consolidated matrix will be sufficient to allow Prime Clerk to provide notice to all creditors as well as applicable parties in interest during these cases.

**(iv)    *Application of Debtors for Appointment of Prime Clerk LLC as Claims and Noticing Agent (the "<u>Claims and Noticing Agent Retention Application</u>")***

70.    The Debtors request authority to appoint Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the terms and provisions of that certain Engagement Agreement dated April 19, 2017, by and between CGI and Strack and Prime Clerk (the "**Claims Agent Engagement Agreement**"), effective *nunc pro tunc* to the Commencement Date.  Prime Clerk's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  I believe the Debtors' selection of Prime Clerk to serve as their Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c).  Specifically, the Debtors have solicited and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.

71.    I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  The terms of Prime Clerk's retention are set forth in the Claims Agent Engagement Agreement attached to, and filed contemporaneously with, the Claims and Noticing Agent Retention Application.  Appointment of Prime Clerk as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

**B.** **Operational Motions Requesting Immediate Relief**

(i) ***Motion of Debtors for Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "Cash Collateral Motion")***

72.     The Debtors require access to cash collateral (as such term is defined in the Bankruptcy Code, "**Cash Collateral**") to be able to continue executing their chapter 11 strategy in the period between the Commencement Date and any order approving the Debtors' anticipated DIP Facility.  The Prepetition Secured Lenders, which have security interests in the Cash Collateral, are expected to consent to the Debtors' use of Cash Collateral subject to the terms of the proposed Interim Cash Collateral Order (as defined in the Cash Collateral Motion), which as of the filing of this Declaration was being finalized.

73.     Use of Cash Collateral is necessary for the Debtors to continue maintaining critical business relationships with their employees, vendors, and suppliers.  Without authority to use Cash Collateral, even for a limited time, the Debtors would have insufficient unencumbered cash to continue operating.  Accordingly, access to Cash Collateral is essential for the Debtors to assure their customers, along with their employees and suppliers, that the Debtors have sufficient working capital to continue operating in the ordinary course of business pending completion of their postpetition Sale Process. If immediate access to Cash Collateral is not authorized, the Debtors likely would suffer immediate and irreparable harm and would be unable to preserve their enterprise value or the value created through the prepetition phase of the Sale Process.   Indeed, any ability to consummate going-concern transactions for the sale of the Debtors' assets would be jeopardized.

74.     The terms of the Interim Cash Collateral Order were the product of good faith negotiations between the Debtors and the Prepetition Secured Lenders.  As a result, and as

described in the Cash Collateral Motion, the parties negotiated the consensual use of Cash Collateral and adequate protection for the Prepetition Secured Lenders in the form of superpriority administrative expense claims, adequate protection liens, and payment of certain interest, fees, and expenses.

75.    For the reasons set forth above and in the Cash Collateral Motion, I believe that the Debtors should be authorized to use Cash Collateral, and the Motion should be granted.

(ii)    *Motion of Debtors for (I) Interim and Final Authority to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Bank Accounts, and (C) Continue Intercompany Transactions; (II) Waiver of the Requirements of Section 345(b) of the Bankruptcy Code; and (III) Related Relief (the "Cash Management Motion")*

76.    By the Cash Management Motion, the Debtors request interim and final (i) authority to continue their existing cash management system, including the continued maintenance of their existing bank accounts (the "**Bank Accounts**") and business forms, (ii) authority to implement changes to their cash management system in the ordinary course of business, including opening new or closing existing Bank Accounts, and (iii) extensions of time to comply with the requirements of section 345(b) of the Bankruptcy Code, if applicable.

77.    In the ordinary course of business, the Debtors utilize two independent but interconnected cash management systems to collect, transfer, and disburse funds generated by their operations (collectively, the "**Cash Management System**"). As stated, the Cash Management System is composed of two independent systems – (i) one system for Debtors CGI, CGI Joliet, and Raceway Central and its subsidiaries; and (ii) one system for Debtors Strack, SVT, and Currency Express, Inc.

78.    The Cash Management System is tailored to meet the Debtors' operating needs and enables the Debtors to efficiently collect and disburse cash generated by their

business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data. Maintaining the Cash Management System is critical to ensure seamless continuation of transactions and uninterrupted collection of revenues.

79.     Maintaining the Cash Management System in its current state is crucial to the Debtors' continued operations, given the volume of transactions processed through the Cash Management System each day. Any disruption to the Cash Management System would unnecessarily and significantly disrupt the Debtors' operations and impede the successful administration of their chapter 11 cases.

(iii)     ***Motion of Debtors for (I) Interim and Final Authorization to Pay Certain Prepetition Obligations to Critical Vendors and (II) Granting Related Relief (the "<u>Critical Vendors Motion</u>")***

80.     The Debtors seek entry of an order (i) authoring the Debtors to pay up to $3.4 million (the "**Critical Vendor Cap**") in aggregate prepetition claims of certain vendors, suppliers, service providers, and other similar entities that the Debtors determine, in their reasonable business judgment, are essential to their ongoing business operations and maximization of value of the Company's enterprise (such vendors, the "**Critical Vendors**;" and, their prepetition claims, the "**Critical Vendor Claims**"); (ii) approving the form of Vendor Agreement (as defined in the Critical Vendors Motion); and (iii) granting related relief.

81.     The success of the Debtors' businesses depends, in large part, on the Company's access to and relationship with its network of vendors and suppliers that deliver essential goods to the Debtors' facilities and stores. Even minor disruptions in the Debtors' supply chain can have far-reaching economic and operational impact for the entire enterprise. The Debtors' carefully-designed inventory system is the means through which their customers

receive daily deliveries of nationally branded and private label products, including baked goods, dry groceries, frozen foods and desserts, carbonated beverages and water, snack foods, and fresh and perishable foodstuffs.  A large percentage of the goods purchased by the Debtors are high-turnover perishable inventory, such as eggs, butter, and milk—all of which must be replaced frequently and quickly to ensure that the Debtors' shelves do not suddenly go barren of staple foods.  Many of the Critical Vendors are invaluable, as they are sole- or limited-source or high-volume suppliers for certain popular branded or otherwise "in-demand" goods (as determined by particular local or regional customer preferences).  In addition, many of the Debtors' beer, wine, and liquor distributors hold exclusive distribution rights to a particular geographic region—effectively requiring the Debtors to utilize these particular merchandisers as sole-source providers in those areas.  It is absolutely essential that the Debtors maintain a full and replenishable stock of all such goods at all times.

82.     The vast majority of the Debtors' inventory is provided by vendors that, for the most part, conduct business with the Debtors on an invoice-by-invoice basis, and not pursuant to long-term supply contracts.  These vendors typically supply customers with products on trade terms based on their experience with and perceived risk of conducting business with such customers.  As a result, the Debtors have limited leverage to compel performance from Critical Vendors on commercially reasonable terms.  The Debtors' position is further weakened by their inability to obtain certain branded products in highest demand from alternative third-party suppliers.  Moreover, because the Debtors' vendor network includes a number of nominally-distinct, but affiliated Critical Vendors, the Debtors' failure to pay one Critical Vendor could have a rippling effect, negatively impacting the Debtors' relationship with multiple Critical Vendors and access to their product offerings on commercially reasonable terms.

32

83.     The Debtors' relationships with some of their vendors have grown increasingly strained in the weeks leading up to the commencement of these chapter 11 cases. A number of vendors unilaterally tightened trade terms, including requiring cash on delivery and requiring the Debtors to pay outstanding trade claims before shipping any new goods. The Debtors anticipate that this trade contraction and downward pressure on their liquidity will only accelerate if they cannot immediately pay their Critical Vendors, not to mention the inability to obtain essential merchandise. Any further reduction in working capital could prove devastating to the Debtors' operations and efforts to maximize value for their estates. Accordingly, payment to the Critical Vendors is crucial to the success of these chapter 11 cases and driving value for creditor recoveries.

84.     The Debtors and their advisors engaged in a comprehensive process to (i) identify those vendors, suppliers and/or service-providers that may be "critical" to the Debtors' businesses and (ii) develop a Critical Vendor cap based on an estimate of the aggregate amount of outstanding Critical Vendor Claims as of the Commencement Date.

85.     More specifically, the Debtors and their advisors spent substantial time and effort reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships that, if lost, could materially harm the Debtors' businesses. In this process, the Debtors considered a variety of factors, as set forth in the Critical Vendors Motion.

86.     The Debtors reviewed a universe of approximately 10,000 separate accounts in their accounts payable system. The Debtors identified approximately 300 active accounts of vendors whose claims may be subject to the Warehousemen, Lienholders, and

33

PACA/PASA Motion (defined below).   Of the remaining accounts, the Debtors identified approximately 170 Critical Vendors, and an additional approximately forty (40) active accounts of beer, wine, and liquor suppliers.   A substantial majority of the Critical Vendors are vendors that (i) supply top-of-mind brands customers expect to find in the Debtors' stores, (ii) do not have a contractual relationship with the Debtors, and (iii) are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations.

87.     The Debtors estimate that, as of the Commencement Date, the Critical Vendor Cap is approximately eight percent (8%) of the Debtors' total accrued payables of approximately $42.5 million and that approximately eighty-four percent (84%) of the Critical Vendor Cap will be used to pay claims that may be entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code.

88.     Absent the relief requested in the Critical Vendors Motion, Critical Vendors may have no incentive to continue providing the Debtors with trade credit or, in some cases, may be legally prohibited from providing trade credit.  In fact, many vendors have already begun demanding accelerated payment, cash-in-advance or cash-on-delivery.  Further contractions could be catastrophic for the Debtors, their estates, and all stakeholders.  In contrast, the preservation of working capital through the retention or reinstatement of trade credit in sufficient amounts and on favorable terms will conserve liquidity, stabilize the Debtors' business operations, and facilitate their ability to maximize value.

RLF1 17513825V.1

**(iv)** ***Motion of Debtors for Interim and Final Authority to (I) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, (III) Continue Employee Benefits Programs, and for Related Relief (the "Wages and Benefits Motion")***

89.    The Debtors request authority, but not direction, to maintain and continue to honor and pay all amounts arising from the Debtors' business practices, programs, and policies for and with respect to their employees (the "**Employees**") that were in effect as of the Commencement Date, and as may be modified or supplemented from time to time in the ordinary course of business, relating to, among other things (i) Compensation Obligations, Deductions, Payroll Taxes, Payroll Services, and Other Administrative Services; (ii) the Supplemental Workforce; (iii) Reimbursable Expenses and the Corporate Card Program; (iv) Employee Benefit Programs, in accordance with their terms; (v) the Severance Programs (for non-insider employees); (vi) the Union Employee Benefit Programs; (vii) the 401(k) Savings Plans; and (viii) the Other Employee Programs (each as defined in the Wages and Benefits Motion, and collectively, the "**Employee Obligations**").  As of the Commencement Date, certain prepetition obligations to Employees may be due and owing.

90.    The majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for Compensation Obligations, Reimbursable Expenses, and Employee Benefit Programs.  Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the Health Care, Insurance, or Disability Plans (each as defined in the Wages and Benefits Motion), Employees will not receive appropriate coverage and, thus, may become obligated to pay certain health care and related claims in cases where the Debtors have not paid the respective providers.  The loss of such

coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.

91.     Failure to satisfy certain prepetition obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses. Without the relief requested in the Wages and Benefits Motion, the Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors.  The loss of valuable Employees, who are essential to the Debtors' operations, would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet customer demands and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy. Additionally, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.

     **(v)**     ***Motion of Debtors for Authorization to (I) Continue to Maintain Their Insurance Policies and (II) Honor All Insurance Obligations (the "<u>Insurance Motion</u>")***

92.     The Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) continue to maintain their Insurance Policies and Programs (as hereinafter defined) and honoring their Insurance Obligations (as hereinafter defined) in the ordinary course of business during the administration of these chapter 11 cases; (ii) pay any prepetition Insurance Obligations, including amounts owed to the Insurance Service Providers (as defined in the Insurance Motion); and (iii) modify the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Debtors' workers' compensation programs (the "**Workers' Compensation Programs**").  In furtherance of the foregoing, the Debtors should also be allowed to increase, renew, or extend their insurance coverage if they determine, in their reasonable business judgment, that such action is necessary.

36

93.     In connection with the operation of the Debtors' businesses and the management of their properties, the Debtors maintain various insurance policies and workers' compensation programs (collectively, the "**Insurance Policies and Programs**" and all premiums and other obligations related thereto, including any broker or advisor fees, assessments, or other fees, collectively, the "**Insurance Obligations**") through several different insurance carriers (the "**Insurers**").

94.     The Debtors utilize the brokerage services of Marsh USA, Inc. (the "**Broker**") to assist with the procurement and negotiation of certain Insurance Policies.   In certain circumstances, the Broker also remits payment to the Insurers on behalf of the Debtors for the relevant policy periods.   The Broker's fees are generally paid through the premium payments made on account of the Insurance Policies.

95.     Paying the Insurance Obligations in the ordinary course of business is a necessary cost of preserving the Debtors' estates.   In addition, I understand the Debtors are contractually and legally obligated to maintain certain types of insurance under their prepetition indebtedness agreements, chapter 11 operating guidelines, and applicable non-bankruptcy law. For example, I have been advised that applicable state law mandates that certain Debtors maintain workers' compensation coverage for their employees, or the Debtors could be prohibited from operating their businesses.   The Debtors' failure to maintain the Workers' Compensation Program could jeopardize their coverage and expose the Debtors to fines and other adverse actions by state workers' compensation boards.   In addition, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact the financial well-being and morale of not just those claimants but also the Debtors' active employees.   In addition, the Insurance Policies

and Programs are essential to the Debtors' operations, as the Debtors would be exposed to significant liability if the Insurance Policies and Programs were allowed to lapse or terminate. Such exposure could have a materially adverse impact on the Debtors' chapter 11 strategy.

### (vi) *Motion of Debtors Authorization to Pay Certain Prepetition Taxes and Fees ("Taxes and Fees Motion")*

96.    By the Taxes and Fees Motion, the Debtors seek entry of an order authorizing, but not directing, the payment of certain taxes, assessments, fees, and other charges in the ordinary course of business (without regard to whether such obligations accrued or arose before or after the Commencement Date), including any such taxes, assessments, fees, and charges subsequently determined upon audit, or otherwise, to be owed (collectively, the "**Taxes and Fees**").

97.    In the ordinary course of operating their businesses, the Debtors collect, withhold and incur an assortment of Taxes and Fees that they remit periodically to various federal, state and local taxing, licensing, regulatory and other governmental authorities (collectively, the "**Authorities**"). The Taxes and Fees generally fall into the following categories: (i) Sales and Use Taxes, (ii) Income Taxes, (iii) Real Property Taxes, (iv) Personal Property Taxes, (v) Other Taxes and (vi) Fees (each as defined in the Taxes and Fees Motion).

98.    It is my understanding that many of the Taxes and Fees collected prepetition are not property of the Debtors' estates but, rather, are held in trust for the Authorities.  The Debtors also seek to pay certain Taxes and Fees to, among other things, forestall Authorities from taking actions that may interfere with the Debtors' administration of their chapter 11 cases.  Such interference could include bringing personal liability actions against directors, officers, and other key employees (whose full-time attention to the Debtors' chapter 11 cases is required to avoid business disruptions and to maximize recoveries to the Debtors'

38

creditors), asserting liens on the Debtors' property, or assessing penalties or significant interest on past-due taxes.  In addition, I have been advised that non-payment of certain Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.

      **(vii)**    *Motion of Debtors for Authorization to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations (the "<u>Customer Programs Motion</u>")*

      99.    The Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) maintain and administer prepetition customer programs, promotions, and practices, and (ii) pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Commencement Date, as necessary and appropriate in the Debtors' business judgment.

      100.    The Debtors' businesses depend on the loyalty of their customers.  To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of business, various practices and programs to reward and provide incentives to existing customers and to attract new customers (collectively, the "**Customer Programs**").  Customer Programs are standard in the food distribution and retail food businesses.  Without the ability to continue the Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing customer loyalty, goodwill, and market share, which would cause a precipitous decline in the value of their businesses and could materially impair their ability to consummate their chapter 11 sales strategy.

      **(viii)**    *Motion of Debtors for Authorization to (A) Pay Prepetition Claims of Warehousemen and Third Party Lien Claimants, (B) Confirm Administrative Expense Priority of Undisputed Commencement Date Orders and Satisfy Such Obligations in the Ordinary Course of Business, and (C) Pay PACA/PASA Claims (the "<u>Lien Claimants/PACA/PASA Motion</u>")*

      101.    The Debtors seek an order authorizing them to pay (a) Warehousing Charges, (b) Third Party Lien Claims, (c) certain amounts in connection with Commencement

Date Orders, and (d)  PACA/PASA Claims (each as defined in the Lien Claimants/PACA/PASA

Motion).

102.    The Debtors must ensure that the Distribution Center and Strack Stores are

continuously replenished with a saleable supply of goods including, but not limited to, fresh

produce, canned goods, baked goods, dairy products, eggs, meats, seafood, floral products,

alcoholic beverages, and various non-food products. The Debtors maintain the flow of

merchandise into their warehouses and the Strack Stores in several ways.  Some suppliers deliver

merchandise directly to the Debtors' warehouses and Strack Stores.   Other suppliers deliver

merchandise via third-party transporters (collectively, the "**Shippers**") to warehouses operated

by third parties (together with the Shippers, the "**Warehousemen**") who receive and store the

merchandise in their warehouses prior to ultimate delivery to the Debtors' warehouses and the

Strack Stores.

103.    If the Debtors fail to reimburse the Warehousemen for charges incurred in

connection with the transport and storage of merchandise, various state laws would permit the

Warehousemen to assert statutory liens against the merchandise in their possession and the

subject of any delinquent charges, which would secure such charges but also potentially block

the Debtors' access to the stored merchandise.  In order to maintain access to and preserve the

value of merchandise essential to the continued viability of the Debtors' operations, the Debtors

seek authority to honor outstanding invoices related to shipping and warehousing services

provided to the Debtors prior to the Commencement Date (collectively, the "**Warehousing**

**Charges**").

104.    The Debtors regularly make improvements and repairs to their properties

and certain equipment used in the operation of their businesses.  Such equipment includes motor

vehicles, refrigeration and electrical systems, plumbing, elevator and escalator systems, and various types of food service equipment, all of which are integral to the seamless operation of the Strack Stores and the Warehouses.  The Debtors contract with a number of third parties (collectively, the "**Third Party Lien Claimants**" and, together with the Warehousemen, the "**Lien Claimants**"), including certain subcontractors to procure the services and labor necessary to make regular improvements and repairs

105.    Paying the Lien Claimants will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Otherwise, the Lien Claimants could be unwilling to release merchandise in their possession on which they may assert liens, as releasing such goods could result in the conversion of their claims against the Debtors from secured to unsecured status.  Absent authorization to satisfy outstanding Third Party Lien Claims (as defined in the Lien Claimants/PACA/PASA Motion), the Debtors could be denied access to merchandise critical to their business operations.  If the Lien Claimants possess lien rights with respect to Merchandise in their possession and/or have the ability to exercise "self-help" remedies to secure payment of Third Party Lien Claims, failure to satisfy such claims could have a materially adverse effect on the Debtors' businesses, which would be to the detriment of the Debtors' estates and their economic stakeholders.

106.    Prior to the commencement of their chapter 11 cases, the Debtors placed with various vendors and suppliers a number of orders for merchandise that will not be delivered until on or after the Commencement Date (collectively, the "**Commencement Date Orders**"). In fear of becoming general unsecured creditors of the Debtors' estates, suppliers may refuse to complete the delivery of merchandise included in Commencement Date Orders or simply recall such shipments altogether.  Some suppliers may go further and refuse to deliver future orders to

the Debtors unless the Debtors issue substitute postpetition purchase orders or pay for merchandise in advance of delivery.  The attendant disruption to the continuous and timely flow of Merchandise to the Debtors' warehouses and the Strack Stores, and any resulting inability to keep the warehouses and Strack Stores adequately stocked with merchandise could be catastrophic for the Debtors' businesses.  Accordingly, the Debtors seek the Court's confirmation of the administrative expense priority status of the Commencement Date Orders and request authorization to pay such orders in the ordinary course of business.

107.    The Debtors believe that a certain portion of the merchandise supplied to their Members and customers may qualify as "perishable agricultural commodit[ies]" under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq*. ("**PACA**").  The definition of "perishable agricultural commodity" under PACA generally includes "[f]resh fruits and fresh vegetables of every kind and character [whether or not frozen or packed in ice]."  7 U.S.C § 499a(b)(4).  I am advised that, under PACA, eligible produce suppliers and their agents (the "**PACA Claimants**") are the beneficiaries of a statutory trust (the "**PACA Trust**") in all of the buyer's perishable agricultural commodity inventory or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "**PACA Trust Assets**").  See 7 U.S.C. § 499e(c)(2).  It is my understanding that PACA Trust Assets are preserved as a non-segregated floating trust and may be commingled with non-trust assets, and are not property of a debtor's estate.

108.    Similarly, certain of the Debtors' suppliers (the "**PASA Claimants**" and, together with the PACA Claimants, the "**PACA/PASA Claimants**") may be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 *et seq*.

("**PASA**"), which prescribes the conditions of operations for businesses dealing in livestock and poultry.  PASA creates a statutory trust (the "**PASA Trust**" and, together with the PACA Trust, the "**Statutory Trusts**") scheme, which is virtually identical to the PACA Trust in respect of delivery of livestock, meat products and related products, products derived therefrom and the proceeds related to the sale of such commodities or products.

109.   PACA/PASA Claimants may be eligible to assert claims under the respective statutes for outstanding payments owed by the Debtors on account of applicable merchandise (collectively, the "**PACA/PASA Claims**").  In particular, the Debtors estimate that, as of the Commencement Date, PACA/PASA Claimants hold approximately $10.5 million in unpaid PACA/PASA Claims.  Because the PACA/PASA Claimants may impose a Statutory Trust on certain of the merchandise and thereby obtain priority ahead of all other secured and unsecured creditors of the Debtors' estates, it is my understanding that the Debtors' payment of valid PACA/PASA Claims will not prejudice or affect the amount of recoveries available to other creditors.

**(ix)**   **Motion of Debtors for Authorization to (I)Maintain Certain Trust Funds Programs, (II) Release Certain Funds Held in Trust, and (III) Continue to Perform and Honor Related Obligations (the "Trust Funds Motion")**

110.   In the ordinary course of business, the Debtors engage in certain marketing and sales practices that are, among other things, designed to offer a convenience to their customers, attract new customers, promote loyalty among the Debtors' existing customer base, and produce alternative streams of income.  Examples include selling lottery tickets and offering onsite charitable donation and bill payment services.  The Debtors are also parties to other beneficial relationships with certain vendors and suppliers that produce additional streams of income for the Debtors.  It is important for the Debtors to honor their obligations in

connection with their Trust Funds Programs (as defined herein) to preserve reputational integrity and continue attracting existing and new customers to their stores.

111.    By the Trust Funds Motion, the Debtors request authority, but not direction, to continue to perform and honor obligations under programs or other arrangements requiring the Debtors to release certain funds held in trust for the benefit and on behalf of non-Debtor third parties.

(x)    ***Motion of Debtors for Interim and Final Authorization to (I) Approve Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establish Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibit Utility Providers from Altering, Refusing, or Discontinuing Utility Service (the "Utilities Motion")***

112.    The Debtors request entry of an interim and final order (i) approving the Debtors' proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing utility service on account of outstanding prepetition invoices.

113.    In the ordinary course of their businesses, the Debtors incur utility expenses, including those relating to electricity, natural gas, water, sewage, and telecommunications.  Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and restructuring process.  Indeed, any interruption in utility services—even for a brief period of time—would disrupt the Debtors' ability to continue operations and service their customers.  This disruption would adversely impact customer relationships, compromise the Debtors' Sale Process, and would result in a decline in the Debtors' revenues.  It also would affect the value of inventory and, particularly items like perishable goods and frozen food.  Such a result could seriously jeopardize the Debtors'

44

restructuring efforts and, ultimately, creditor recoveries. Therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

### Conclusion

114. This Declaration describes the factors that have precipitated the commencement of the Debtors' chapter 11 cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Motions.

115. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: May 4, 2017
      Chicago, Illinois

        */s/ Donald E. Harer*
        Name:  Donald E. Harer
        Title:   Chief Restructuring Officer
             Central Grocers, Inc.
             Strack and Van Til Super Market, Inc.

RLF1 17513825V.1

**Exhibit A**

**Corporate Organizational Chart**

# Corporate and Capital Structure

